[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12668

Non-Argument Calendar

_____

V. ANNE TALTON,

Plaintiff-Appellant,

*versus*

AMERICAN FAMILY INSURANCE COMPANY,

Defendant,

AMERICAN FAMILY LIFE INSURANCE COMPANY,
AMERICAN STANDARD INSURANCE COMPANY
OF WISCONSIN,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-02571-MHC

_____

Before WILSON, JORDAN, and NEWSOM, Circuit Judges.

PER CURIAM:

In this breach of contract action, Anne Talton sued American Family Life Insurance Company and American Standard Insurance Company of Wisconsin (collectively, AFI) for terminating her Agent Agreement without notice. AFI says that it was entitled to terminate Talton's Agent Agreement without notice because Talton engaged in dishonest and disloyal conduct when she provided coverage on an insurance claim by backdating a lapsed policy. The district court granted summary judgment to AFI, finding no genuine issue of material fact as to whether Talton engaged in dishonest and disloyal conduct by backdating the policy. After careful review, we affirm.

I.

In October 2008, Talton signed an Agent Agreement with AFI, an insurance company offering auto, property, commercial, and life insurance. The Agent Agreement provided that Talton

would be an independent contractor for AFI.  In Section 4 of the Agent Agreement, Talton agreed to the following provisions:

> That you shall not have the authority to extend the time of payment of any premium or alter, waive or forfeit any of the Company's rights, requirements or conditions in any policy of insurance or otherwise obligate the Company in any way except as stated in this agreement or expressly authorized under the rules and regulations of the Company or previously authorized in writing by the Company.
>
> . . . .
>
> To maintain a good reputation in your community and to direct your efforts toward advancing the interests and business of the Company to the best of your ability, to refrain from any practices competitive with or prejudicial to the Company and to abide by and comply with all applicable insurance laws and regulations.

Section 6.h.2 outlined the conditions under which AFI could terminate the Agent Agreement.  AFI was to provide six months' written notice before termination unless Talton engaged in "dishonest, disloyal or unlawful conduct."  In that scenario, AFI could terminate the Agreement without notice.  Talton was also subject to AFI's Code of Conduct, which required agents to "fully cooperate" with internal company investigations, and stated that

violations of the Code "may result in disciplinary action up to and including termination of the agent agreement."

The events giving rise to this lawsuit stem from a client of Talton's named T.B.  On March 19, 2013, T.B. reached out to Talton and explained that he had called AFI to report hail damage to one of his cars, but had been told that his auto policies were cancelled.  According to T.B.'s Statement of Account History, he had three active auto policies, all of which were "cancelled due to non-payment of premium" on March 15, 2013.  Talton set up a conference call between herself, T.B., and a billing representative to discuss T.B.'s policy.  During that call, Talton stated that she would reinstate his policy and "backdate" it to March 15th to ensure that his claim would be covered.  A transcript of the call—the accuracy of which Talton does not dispute—records the following exchange:

> Talton: I'm just going to reinstate [T.B.'s policy] from the day it went out of force on the 14th so he won't have a break in coverage. . . .
>
> Sanchez: Okay.  Then you would need to do the 15th because he canceled the 15th.
>
> Talton: Okay.  So we could do it as of the 15th. And if I reinstate it as of the 15th, then he won't have a break in coverage?
>
> [Billing Representative]: Correct.
>
> Talton: And the reason why is because he's had a— he's got a claim and he's not going to get it covered

because his policy's out of force if I don't backdate it to the 15th.

[Billing Representative]: Okay. I—I can't advise that one, Anne, that would be something you would have to speak with the underwriter.

Talton: But up until this point his policy hasn't canceled, so and it's only, it's less than five days so I'm comfortable with him going back to that and just using his current premium. . . . Okay.  T.B., if you could make a payment of $252.82, that'll take you up until April 16th.

T.B.: Thank you.

T.B. paid the requested balance over the phone.  His Statement of Account History shows that his three auto policies were then reinstated for coverage from March 15, 2013 through April 16, 2013.

The day after the conference call, AFI's Compliance and Ethics Department (Compliance) contacted Michael Marlin, Talton's sales district leader, and Michael Riggs, Talton's state sales director. Compliance explained to Marlin and Riggs that it would be investigating whether Talton had backdated an insurance policy to provide coverage during the period a policy was in cancellation for nonpayment.  As part of the investigation, Compliance asked Talton why she had reinstated T.B.'s policy effective March 15th when

T.B. had not paid until March 19th. Talton responded that she had "reinstated [the policy] with no lapse in coverage as a courtesy."

Compliance requested additional documents from Talton and asked questions related to the reinstatement of T.B.'s policy, but Talton did not respond to these requests and interrogatories. In an email, she apologized for not having responded and stated that she "had some staffing challenges." When Compliance completed its investigation in late April, it concluded that Talton had improperly backdated T.B.'s policy. The investigation found that AFI paid $2,487.30 to cover T.B.'s claim as a result of Talton's backdating the policy. Compliance also flagged eleven other policies that Talton appeared to have backdated.

A few weeks later, on May 9, 2013, Marlin met with Talton to discuss the investigative findings. During the meeting, Marlin took contemporaneous notes which he shared with Talton afterward. According to Marlin's notes, he informed Talton that backdating insurance policies undermined AFI's profitability and was prejudicial to the company. Talton responded that she was busy and multitasking during the conference call with T.B. and the billing representative. She said that she was uncertain "how billing rules and regulations work and what would cause [T.B.'s] policy to be active or not at the time of the loss." She insisted that she had not attempted to do anything fraudulent.

On May 17, Riggs signed an approval of Talton's termination, stating that Talton "had several compliance violations," and had failed to comply with company rules and guidelines. The

approval form had a line item asking "Did the company terminate the agent for violation of their agent agreement?" The answer "No" was marked on the form. Later that day, Riggs and Marlin met with Talton. Again, Marlin took notes which Talton agrees were accurate. Riggs explained to Talton that AFI was terminating her Agent Agreement effective immediately for backdating T.B.'s policy. Talton stated that any issues with backdating coverage were attributable to gaps in training. Nevertheless, Riggs provided Talton with a termination letter stating that AFI had decided to terminate her contract for the reasons discussed in the meeting.

With respect to Talton's handling of T.B.'s insurance policy, AFI also referred a complaint to Georgia's Office of Insurance and Safety Fire Commissioner (Georgia DOI). Georgia DOI issued Talton a warning letter on August 8, 2013, stating that:

> [I]t is clear that you were aware that [T.B.'s policy] was not covered . . . and that you purposefully backdated his policy in order for him to have coverage for the loss. At this time, we do not feel that there is sufficient evidence to warrant administrative action or criminal prosecution against you or your license . . . . Given the current circumstances, the Department has chosen to informally admonish and direct you to henceforth comply with all applicable provisions of Georgia law related to licensed agents.

Years later, in May 2019, Talton filed a breach of contract action against AFI in Fulton County Superior Court. AFI removed

the case to federal court.  After discovery commenced, AFI took Talton's deposition on August 27, 2020.  When pressed as to whether she backdated T.B.'s insurance policy, Talton stated in her deposition that she did not recall doing so.  She could not remember, one way or another, whether she had backdated the policy. On September 28, 2020, following Talton's deposition, AFI moved for summary judgment.  In response, Talton submitted her own affidavit in which she stated, among other things, that she "never backdated the client's payment to provide coverage under a cancelled policy."  She added that she did "not have the authority to do so."  With regard to the reinstatement of T.B.'s policy, Talton explained that she "simply contacted the billing center, along with my client, in order to assist him with straightening out a billing issue."

On July 6, 2021, the federal district court entered an order granting AFI summary judgment.  In its order, the district court held that there was no genuine issue of material fact as to whether Talton backdated T.B.'s policy.  In reaching this conclusion, the district court relied on evidence from the conference call with T.B. and a billing representative, as well as Compliance's investigative findings.  As for Talton's affidavit, the district court held that it was conclusory and thus insufficient to create a dispute of material fact. Next, the court held that Talton had engaged in dishonest, disloyal, or unlawful conduct by backdating T.B.'s policy and failing to cooperate in AFI's investigation, thus authorizing AFI to terminate the Agent Agreement without notice.  Talton timely appealed.

II.

Talton argues on appeal that: (1) there is a dispute of fact as to whether and why she backdated T.B.'s insurance policy; and (2) that her conduct did not amount to dishonesty or disloyalty, such that AFI could terminate the Agent Agreement without six-months' notice.  We address the question of backdating first, and then turn to whether Talton's conduct was dishonest or disloyal.

A.

We review de novo a district court's grant of summary judgment.  *Whatley v. CNA Ins. Companies*, 189 F.3d 1310, 1313 (11th Cir. 1999) (per curiam).  To survive a motion for summary judgment, a nonmoving party must present evidence that creates a dispute of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A litigant cannot create a genuine issue of material fact "simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."  *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).

After reviewing the record on appeal, we find that there is no genuine issue of material fact as to whether Talton caused T.B.'s insurance policy to be reinstated effective March 15—four days before Talton's conference call with a billing representative and T.B.  Notably, Talton's comments during the conference call establish that she knew T.B.'s policy was not in force at the time he incurred

a loss, and that his claim would not be covered unless she back-dated his policy.  Talton asked: "And if I reinstate it as of the 15th, then he won't have a break in coverage?"  When the billing representative confirmed that was true, Talton continued: "And the reason why is because . . . he's got a claim and he's not going to get it covered because his policy's out of force if I don't backdate it to the 15th."  Talton then stated that she would backdate the policy, and—sure enough—T.B.'s account statement later showed that the policy was reinstated effective March 15th, four days before the conference call.

Talton's deposition does not create a dispute of fact on this point.  In her deposition, Talton did not deny that she "reinstated [T.B.'s] policy back to when it lapsed."  She testified that she had trouble recalling what happened eight years ago, and that she could not say definitively whether or not she had backdated the policy.  To be sure, Talton testified differently in her affidavit, stating plainly that she did not backdate the policy.  But that denial, which contradicts both her deposition testimony that she could not recall whether she backdated the policy and her statements made during the conference call, cannot create a genuine issue of material fact.  *See Pol'y Mgmt. Sys. Corp.*, 526 U.S. at 806.  Therefore, there is no genuine issue of material fact as to whether Talton backdated the policy.

B.

Talton argues next that, in any event, AFI was required to provide her with six months' notice before terminating the Agent

Agreement.  Recall that the Agent Agreement required six months' notice prior to termination, unless the agent engaged in dishonest, disloyal, *or* unlawful conduct.  AFI is thus entitled to summary judgment if Talton's conduct fell in any of those three buckets. Our analysis begins (and, as it turns out, ends) with disloyalty.

Under Georgia contract law, which applies here, contract interpretation is a legal question reviewed de novo.  *Albritton v. Kopp*, 796 S.E.2d 676, 678 (Ga. 2017).  The Georgia Supreme Court has held that the first step in construing a contract is to determine "whether the language therein is clear and unambiguous." *Id.*  "[I]f it is, the contract is to be enforced according to its clear terms; the contract alone is looked to for its meaning." *Id.*  The plain meaning of "disloyal," as the district court explained, is "lacking in loyalty," and "showing an absence of allegiance, devotion, obligation, faith, or support." *Disloyal*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014).  Applying that definition to Talton's conduct, no reasonable juror could find that Talton's actions were not, at a minimum, disloyal to AFI.  The Agent Agreement spelled out that Talton was not to obligate AFI to pay claims it was not required to pay unless she had authorization to do so.  By backdating T.B.'s policy, without authorization, to ensure that his claim was covered—thus obligating AFI to pay $2,487.30 that it otherwise would not have been required to pay—Talton engaged in conduct showing a lack of loyalty to AFI.

Talton contends that, nevertheless, a genuine issue of material fact exists because AFI checked a box on the termination

approval form indicating that the termination was not for a violation of the Agent Agreement. As the district court noted, however, Marlin stated under oath that this was a clerical error by his administrative assistant. And when reviewing the entire record, the reasons for Talton's termination are evident. The investigative summary from Compliance, which was sent to Riggs and Marlin, concluded that Talton's actions were "contradictory to the best interests of [AFI]," and that Talton "appear[ed] to have engaged in patterns of behavior which clearly are not in the best interest of [AFI] and may expose the company to unnecessary regulatory, litigation, or ethical compliance risk." At the May 17 termination meeting, Riggs explained to Talton that she had violated the Agent Agreement, as well as the Code of Conduct, and "that her actions were unethical, dishonest, disloyal, and prejudicial to [AFI]." The termination letter Riggs provided to Talton also stated: "As I informed you during our personal conference on 17 May 2013, [AFI] has made a decision to terminate your contract with the Company[,] . . . [t]he basis for [which] was discussed in our conference of 17 May 2013." Given these facts, no reasonable juror could find that Talton was not terminated for disloyal conduct.

Accordingly, we find that no genuine issues of material fact remain as to whether AFI's termination without notice constituted a breach of the Agent Agreement. We therefore affirm the district court's grant of summary judgment.

**AFFIRMED.**